**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESTATE OF ERNEST GOTTDIENER,<br>ESTATE OF JUDIT GOTTDIENER,<br>ERVIN TAUSKY, and SUAN INVESTMENTS<br>*Plaintiffs*<br><br>vs.<br><br>FELIX SATER and SALVATORE LAURIA<br>*Defendants* | 13-CV-____ (___)<br><br>**COMPLAINT**<br><br>18 U.S.C. §§1961 *et seq.*<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      **ERNEST** and **JUDIT GOTTDIENER** were Holocaust survivors who emigrated here after the war, became citizens, and made a new life. Sadly, in their final years they became the victims, almost 20 years ago, of criminals who, supported by members of Mafia and Russian organized crime, carried on together a scheme of securities fraud by which they bilked the **GOTTDIENERS** alone out of some $7,000,000, and all victims together at least $100,000,000.

2.      Non-party **ALFRED PALAGONIA** was one of these criminals. He was caught, pled guilty to federal and state racketeering charges, admitted his wrongdoing, served time in prison, has paid some restitution, and for the most part can be said to have accepted responsibility.

3.      **FELIX SATER** and **SALVATORE LAURIA** were another two of these criminals. But not only have they not accepted responsibility, they were protected from it *for almost 20 years* protected from all responsibility, protected from all accountability, and protected from all liability for all that they did to cause so much harm to so many victims. Who protected them?

4.      The United States Attorney, Eastern District of New York, under color of pretextual judicial authority.

5.     **SATER** and **LAURIA**, too, were caught and pled to racketeering charges. But they did so as cooperators. They cut a deal. In return, not only their convictions*, but their entire federal judicial records*, were hidden, so they avoided prison, avoided mandatory forfeiture, avoided mandatory restitution, and for almost 20 years until now avoided civil liability, part of a pattern and practice of maintaining a covert justice system of secret trials, falsified records, and unlawful judgments, where cooperators are allowed to commit crime and keep the proceeds while their victims, if they even find out, are ordered to stand mute and threatened with prison if they don't.

6.     How could such secrecy develop in the United States? The government and courts, at least in the EDNY, simply decided that to win the war on organized crime there would have to be sacrifices, including sacrifices of the civil rights of the public and the victims.

7.     You can't put a price on civil rights. But you can on their loss. Here, it's $500,000,000, by "well managed account theory," what victims' accounts would be worth today had they not been looted. The **GOTTDIENERS** share is $35,000,000 of that.  That's damages computed *qua* securities fraud. But this isn't securities fraud, it's racketeering *predicated on* securities fraud, with trebling. That's $1,500,000,000 for the victims, $100,000,000 for the **GOTTDIENERS**. *That's the economic cost to their victims of protecting **SATER** and **LAURIA** all these years*.

8.     Resolution of the problem of secret courts and secret (in)justice must await another day. What will *not* wait another day is that, though **ERNEST** and **JUDIT** passed a few years ago, having lived their last years never knowing the government of their adopted country, supposedly where the rule of law prevails, was hiding from them that **SATER** and **LAURIA** were main culprits in the fraud on them and were being protected and allowed to keep what they stole, the **GOTTDIENERS**, through their estates and survivors, and by this action, *now demand justice*.

# SUMMARY

## RUSSIAN ORGANIZED CRIME AND THE NEW YORK MAFIA

9.      During the late 1970s and 1980s a great many Russians were able to emigrate to the United States. Many, primarily Ukrainians, primarily Jewish, came to Brooklyn, New York and settled in and around Brighton Beach, in an area that has come to be known as Little Odessa.

10.      Many criminals were among them, including members of Russian organized crime, for example the Mogilevich syndicate, infamous for arms-for-drugs deals with al Qaeda.

11.      In the 1980s, many of these Russian mobsters formed alliances with the Mafia, or La Cosa Nostra ("LCN"). The Genovese Family, one of the "Five Families" of the New York Mafia, for example, was, and remains, particularly involved with Russian organized crime.

12.      Initially, these alliances focused on "plain vanilla" racketeering, so not surprisingly, like organized criminals in every culture, these mobsters immediately set to prey upon their own, the Mafia "getting its beak wet" (that is, getting a cut) by providing collateral support.

13.      For example, one Mikhail Sheferofsky, whose involvement with Russian organized crime as a boss in, reportedly, the Mogilevich syndicate, goes back years, including a conviction in Europe for counterfeiting, emigrated here in the influx and began running an extortion racket in which he, with Ernest Montevecchi, a Genovese soldier, as enforcer ("leg breaker"), preyed on his fellow Russian Jewish immigrants in Brighton Beach for a decade before he was charged by the U.S. Attorney, Eastern District, with extortion and extortion conspiracy. Exh. A. Plaintiffs provide Sheferofsky's example for several urgent reasons, to explain the case at bar:

**SECRET CASES, SECRET INJUSTICE**

14.    **First**, for reasons we can only imagine, *but shouldn't have to*, see ¶qqq, on his guilty plea Sheferofsky was sentenced to probation and assessed $150. Exh. B. Speeding tickets cost more. We shouldn't have to imagine why because when he was sentenced it was, and remains, the will of Congress, expressed by statute, 18 USC §3553, that *no federal judge can sentence anyone but in open court, at least as to pronouncement of sentence and **statement of reasons***, and it was, and remains, the law in this circuit that sentencing hearings may not otherwise be sealed (not legally, anyway) without public notice and a hearing (and never as to reading aloud the sentence and reasons), as *the public has a First Amendment right of access to attend them*.

15.    Yet Sherferofsky's docket shows that he was sentenced in secret, in fact shows that the whole docket was kept sealed *for six years*. Exh. C. What it doesn't show is any evidence that any order exists by which that was a *legal* sealing, as sealing a docket, in some circuits like the 11th *per se* illegal, here in the 2nd at least public notice and a hearing is required.

16.    **Second**, though he pled to extortion and the charge names a victim[1], his docket has no other mention of victims. But at sentencing the court was *required* to impose restitution and ensure the government attorneys had found all the victims and told them of their rights, including restitution, *rather unlikely to have occurred since the whole case was hidden* (the same law that requires open sentencing pronouncements requires a statement of reasons why if such be the case

---

[1] His extortion conspiracy charge names none, so we're to believe he and Montevecchi were the most inept mobsters since *The Gang That Couldn't Shoot Straight*, conspiring for 10 years to extort "Brighton Beach…restaurants, food stores, and a medical clinic," Exh. A, but only managing to get one to pay and not otherwise harming anyone?

there is no, or only partial, restitution). As the judgment, Exh. B, shows no restitution ordered in his secret sentencing when clearly it was due at least that one victim, what can we conclude?

17.     **Third**, apparently (i) this was an unlawfully secret case, especially as to victims; (ii) the secrecy hid an unlawful sentence; and (iii) there was likely no justification for that  (even if the law allowed it), as but weeks after sentencing the judge unsealed the case, making it doubtful that sentencing had to be secret to protect the defendant's safety, unless once it was over (and with it the chance for victims to appear and object), amazingly, any threat to his safety vanished.

18.     **Fourth**, Mikhail Sheferofsky, aka Michael Sater, is **FELIX SATER'S** father. And at the same time his extortion case was being hidden, especially from his victims, he apparently allowed to keep their money, **SATER's** racketeering case was being hidden, especially from *his* victims, he, too, apparently allowed to keep their money. Such are victims' rights in the EDNY.

**THE MOB ON WALL STREET**

19.     By the 1990's, this association of Russian and Mafia organized crime had reached Wall Street. The Mafia would infiltrate small (and not-so-small) brokerage firms and cause the brokers to defraud thousands, primarily the Genovese family providing the backing and all Five Families the muscle, while the Russians provided money laundering and other offshore expertise.

20.     This case is about one firm, **WHITE ROCK**; two who ran it, **SATER** and **LAURIA**; how they defrauded victims, most, like the **GOTTDIENERS**, elderly, of $40,000,000; and how, after they were caught and confessed, they became cooperators, flipping on their co-conspirators in return for having their entire cases, even their sentencings, unlawfully hidden, apparently to

stay hidden forever, letting them evade restitution and emboldening them to commit new crime, **SATER** and **LAURIA** going on to defraud new victims, **SATER** of hundreds of millions, allowed all this time to keep the money he stole from Plaintiffs nearly 20 years ago. Until now. Time's up.

## THE PARTIES AND NON-PARTIES

### PLAINTIFFS

21.      **ERNEST** and **JUDIT GOTTDIENER** were naturalized United States citizens. They passed some years ago. **ERVIN TAUSKY** is **JUDIT's** brother. **SUAN INVESTMENTS** is a family business. Plaintiffs are referred to collectively as "the **GOTTDIENERS**."

22.      As to **JUDIT** and **ERNEST**, this action is brought by their estates, but for convenience, they may be referred to as if they were living souls.

### DEFENDANTS

23.      **FELIX SATER** is a natural person, a twice convicted felon, his first in 1992 for assault with a deadly weapon and his second in 1998 (guilty plea; the conviction became final in 2009 on sentencing without appeal) for racketeering in connection with White Rock, as shown on docket 98-CR-1101 EDNY (Glasser, J.), *U.S. v. Felix Sater* (aka *John Doe*).

24.      **SALVATORE LAURIA** is a natural person, a felon convicted for racketeering in connection with White Rock, as shown on docket 98-CR-1102 EDNY (Glasser, J.), *U.S. v. Salvatore Lauria*. (guilty plea in 1998, final conviction in 2004).

### NON-PARTIES

25. **ALFRED PALAGONIA** was a registered representative at **BLAIR**. See ¶34 *et seq*.

## JURISDICTION

26.    Jurisdiction is original, per 28 U.S.C. §1331, arising under the laws of the United States, e.g. the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.

## VENUE

27.    Venue is pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in New York County, which is in this district.

**ALLEGATIONS
AND
PRELIMINARY RICO STATEMENT**

**COLLATERAL ESTOPPEL BY PRIOR CRIMINAL CONVICTION
AND INCORPORATIONS**

28.     This case is brought pursuant to 18 USC §1964(c) for damages caused by **SATER** and

**LAURIA's** violations of §1962 by their conspiracy to operate, and operation of, enterprises, as

defined in §1961(4), through a pattern of racketeering activity, as defined in §1961(5), for the

common purpose of perpetrating fraud in connection with the purchase and sale of securities.

29.     Both **SATER** and **LAURIA** pled guilty in 1998 to federal racketeering charges based

on informations attached to this complaint, Exhs. E, F. **SATER** was sentenced on October 23,

2009, **LAURIA** on February 25, 2004. Exhs. G, H. Neither appealed.  Their convictions final,

they are preclusively estopped to deny the allegations in their charging instruments (and other

consistent statements as made during their plea hearings in compliance with Fed. R. Crim. P. 11).

(And final judgments are admissible to prove all facts essential to sustain them. FRE §803(22).)

30.     The contents of their charging instruments, without limitation to the extent matters of

preclusive estoppel, are deemed incorporated herein as allegations as if fully set forth herein.

31.     The contents of the indictment in *U.S. v. Coppa* et al., 00-CR-0196 EDNY (Glasser, J.)

are deemed incorporated herein as allegations as if fully set forth herein. Exh. I.

32.     The contents of the indictment in *People v. D.H. Blair* et al., No. 3282/2000, Supreme

Court, NY County, see 2002 NY Misc LEXIS 317, 2002 NY Slip Op 50152U, are deemed

incorporated herein as allegations as if fully set forth herein. Exh. J.

## BACKGROUND

33.      D. H. BLAIR & Co. Inc. ("**BLAIR**") was a registered broker dealer of securities, licensed by the NASD, with an office at 44 Wall Street, New York, New York. Blair commenced operations in or about April 1975 and ceased doing business in or about August 1998.

34.      Non-party **ALFRED PALAGONIA** was a registered representative of **BLAIR** from approximately January 1990 to February 1998. Typically BLAIR's top producer, earning more than $1,000,000 per month, he was the head of the **PALAGONIA GROUP** of brokers[2].

35.      **ERNEST GOTTDIENER** opened his first account with **BLAIR** in late 1992. Additional accounts for **JUDIT**, **TAUSKY**,; and **SUAN**,  were opened thereafter. Due to the transfer of most of the securities in **TAUSKY** accounts to **SUAN** and the deaths of **ERNEST** and **JUDIT**, and pursuant to a litigation agreement among Plaintiffs, the losses for each must be viewed together and Plaintiffs will be considered in the aggregate as "the **GOTTDIENERS**."

36.      At all relevant times herein, the **GOTTDIENERS** were customers of **PALAGONIA**.


### §1961(4) RICO ENTERPRISES 1 AND 2

1.  THE D. H. BLAIR CRIMINAL ENTERPRISE
2.  THE PALAGNOIA GROUP CRIMINAL ENTERPRISE


37.      By 1990, **BLAIR**, a well-known, national investment firm registered with the NASD and the NYSE, had transformed itself into a securities operation set up for the fraudulent sale of

---

[2] **ALFRED PALAGONIA**, Robin Breitner, Alex Dewar, John DiBella, Steven Frantz, Richard Gaydos, Raymond Hernandez, Richard Molinsky, Darren Orlando, Andrew Schandler, and Richard Smith.

new issues and their manipulation in the aftermarket, unconstrained by any concern for its customers' best interests, securities regulations and the criminal law. This continued without interruption through to the firm's demise. To do this, **BLAIR** principals[3] utilized their staff of corrupt brokers, especially if not almost exclusively the **PALAGNOIA GROUP**, who were trained in high-pressure sales tactics, as vehicles for unloading large positions in essentially speculative small-cap securities, without disclosing material information. Acting under the guise of an apparently law-abiding broker-dealer, they began fraudulently manipulating the market for multiple speculative small-cap stocks, with each individual defendant performing an integral function specific to his or her position in the enterprise.

38.     The mechanics of the scheme, often described as a "pump and dump" operation, are summarized as follows, with detailed allegations contained in the indictment, see *People v. D. H. Blair* et al., Exh. J, to which **PALAGNOIA** and others pled guilty.

39.     The corrupt brokers, again especially if not exclusively members of the **PALAGNOIA GROUP** acting under the supervision of **PALAGONIA**, himself coordinating with **BLAIR** principals, would use **BLAIR** to obtain secret control over large blocks of securities then artificially inflate and maintain the price of these securities by means of material misrepresentations and omissions and manipulative sales practices. After inflating the price of the securities, they would sell their secretly controlled securities to the public, generating millions of dollars illicit profits.

---

[3] Chairman Kenton Wood, Vice-Chairman Alan Stahler, and Vice-Chairman Kalman Renov.

40.      When dealing with the investing public, the brokers in the **PALAGONIA GROUP** engaged in high-pressure sales tactics by which they aggressively solicited customer commitments to purchase or hold on to these securities through false and fraudulent representations concerning their financial viability. In doing so, they aggressively recommended stocks to their clients with little regard to their suitability, routinely omitting risks in their sales presentations. They also made unfounded predictions about upcoming events and falsely claimed to possess inside information regarding the security as a result of their fictitious meetings with the management of these companies and privileged status as an underwriter. Moreover, they made false claims that the firm's principals and **PALAGONIA** were invested in the security.

41.      If these sales tactics proved futile, the brokers in the **PALAGONIA GROUP** marketed the promise of future allocations of its new issues to their customers as an easy way to make money quickly without any risks. This enabled the brokers to induce prospective customers to open an account with **BLAIR**, paving the way for future broker solicitations of more risky investments. It was also used as a mechanism for fraudulently inducing the customer to hold on to his or her portfolio of securities at **BLAIR** despite their investment losses. These broker solicitations of customer trades were concealed from the regulators by the broker's attachment of a non-solicitation letter to the customer trade even though the trades were indeed solicited.

42.      Once the customer made the commitment to purchase a security through a broker in the **PALAGONIA GROUP**, the broker was thereafter prohibited from selling the security despite the client's instructions, unless it was executed in accordance with the firm's "no net-sales policy." In other words, the broker was only allowed to sell when directed if he was able to match the order of the selling customer with that of a buy order, thereby avoiding any negative

impact that the sales transaction may have had on the market value of the security. In an effort to conceal this "no net-sales policy" from the regulators, the trading department, at the instruction of **BLAIR** head trader Vito Capotorto, delayed the time stamping of the customer's buy ticket until after that of the sell ticket to avoid the appearance of a crossing transaction.

43.        It must be emphasized that since the whole concept of a "pump and dump" scheme is to push up securities prices to artificial highs, then keep them there long enough for the fraudfeasors and their associates to get out, the allegations herein that customers who had bought the securities were given false and fraudulent material information, as well as having true and correct material information withheld from them, as part of this scheme. That is, the allegations herein a tactic of "fraudulently inducing customers to hold," are made strictly in the context of, and as part of, the unitary fraudulent scheme, that while there were individual cases of course of implementing the tactic of fraudulently inducing this or that customer to hold, at all times those tactics were used strictly as part of the single, intentionally fused scheme of fraudulently inducing both the purchase and the hold as one coherent objective.

44.        This "no net-sales policy" did not, however, apply to Wood, Stahler, and Renov and the firm's favored customers, who were allowed to freely sell their securities holdings at any time. The brokers in the **PALAGNOIA GROUP** never disclosed to their customers, prior to their purchases, that they would be prohibited from selling their security, despite, on occasion, their acceptance of the customers' purchase order, which contained pre-set sell instructions. Wood, Capotorto and Palagonia enforced this "no net-sales policy" through their refusal to allocate future new issues to any broker, who sold their customer's stock in violation of the policy. Additionally, Capotorto threatened to decrease the price on the stock of any customer, who

insisted on selling in violation of the policy. Once the brokers in the **PALAGONIA GROUP** ceased their manipulative efforts and allowed the customers to freely sell their securities holdings, the artificially inflated stock prices began to plummet, causing the unsuspecting investors to incur substantial financial losses.

45.      In doing these things, the fraudfeasors – that is, Wood, Stahler, Renov, Capotorto, and the members of the **PALAGONIA GROUP** – operated **BLAIR**, that is, the legal entity D. H. Blair & Co. Inc., as an enterprise of course legally distinct from themselves. Therefore, for this action, the legal entity which was **BLAIR** was a RICO enterprise, as defined in §1961(4), known herein and referred to in this context as the **D. H. BLAIR CRIMINAL ENTERPRISE.**

46.      The **D. H. BLAIR CRIMINAL ENTERPRISE** maintained a hierarchical structure, which enabled the fraudfeasors to use the legitimate enterprise of **BLAIR** as a vehicle to commit the pattern of criminal activities alleged in the indictment, engaging in a pattern of criminal activity throughout the enterprise's hierarchical structure with the common purpose of fraudulently selling securities to the investing public and manipulating the pricing of such securities in the aftermarket, itself and in combination, *infra*. The enterprise, as a freestanding corporate juridical person, had ascertainable structure, with the top of the structure planning the objectives of the enterprise and directing how the objectives would be achieved, and the middle and bottom levels engaging in activities to carry out the scheme. And, although old members left and new members joined, the structure of **BLAIR** remained constant throughout the time period alleged and continued throughout scores of criminal acts. The structure of the enterprise furnished the means and method for the commission of the crimes, a "system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses."

47.     Again, for the avoidance of ambiguity, although these criminal acts may be otherwise identified as their own crimes, for example of necessity there were thousands of acts of mail and wire communications crossing through interstate commerce to support the scheme, each thus an act of mail and wire fraud, nevertheless those acts were subordinate to and in furtherance of the scheme itself, to earn money through fraud in the purchase or sale of securities.

48.     In addition, for the same reasons except for juridical personhood, the **PALAGONIA GROUP** was an association-in-fact RICO enterprise.

### §1961(4) RICO ENTERPRISES 3, 4, 5

3.  THE WHITE ROCK CRIMINAL ENTERPRISE
4.  THE WHITE ROCK PARTNERS CRIMINAL ENTERPRISE
5.  THE WHITE ROCK BLAIR CRIMINAL ENTERPRISE

49.     White Rock Partners & Co., Inc. ("**WHITE ROCK**"), a registered broker-dealer of securities, commenced operations in 1994, in New York, N.Y. In 1995, the firm was renamed State Street Capital Markets Corporation ("State Street"). The firm ceased operation in 1996[4].

50.     White Rock / State Street was owned and operated by **LAURIA**, **SATER**, and others, collectively the.**WHITE ROCK PARTNERS.** It employed brokers and cold callers.

51.     The business of **WHITE ROCK** consisted primarily of the sale of stock and warrants in small or start-up companies. **WHITE ROCK** frequently underwrote initial public offerings ("IPOs"), by which stock and warrants in formerly privately owned companies were first sold to

---

[4] For convenience, the firm may be referred to herein as White Rock regardless of the date in question.

the public. **WHITE ROCK** also participated extensively in trading securities after they were first sold to the public (referred to herein as "aftermarket" or "aftermarket trading"). **WHITE ROCK** also took part in public offerings of stock and warrants subsequent to an IPO, commonly known as "secondary offerings" of securities.

52.       **WHITE ROCK** held itself out as a legitimate brokerage firm, though it was in fact operated throughout its life for the primary purpose of earning money through a "pump and dump" scheme to defraud in connection with the purchase and sale of securities involving the manipulation of the price of securities pursuant to the same form of, and indeed often involving the same securities as, the **BLAIR** "pump and dump" scheme, as set forth in further detail below.

53.       In doing these things, the **WHITE ROCK PARTNERS**, along with the firm's brokers from time to time, operated **WHITE ROCK**, that is, the legal entity White Rock Partners & Co., Inc. as succeeded by the legal entity State Street Capital Markets Corporation as an enterprise of course legally distinct from themselves. Therefore, for this action, the legal entity which was **WHITE ROCK** was a RICO enterprise, as defined in §1961(4), known herein and referred to in this context as the **WHITE ROCK CRIMINAL ENTERPRISE**.

54.       The **WHITE ROCK CRIMINAL ENTERPRISE** maintained a hierarchical structure, which enabled the fraudfeasors to use the (occasionally) legitimate enterprise of **WHITE ROCK** as a vehicle to commit the pattern of criminal activities alleged in the indictment, engaging in a pattern of criminal activity throughout the enterprise's hierarchical structure with the common purpose of fraudulently selling securities to the investing public and manipulating the pricing of such securities in the aftermarket itself and in combination and affiliation, *infra*. The enterprise, as a freestanding corporate juridical person, had an ascertainable structure, with the top of the

structure planning the objectives of the enterprise and directing how the objectives would be achieved, and the middle and bottom levels engaging in activities to carry out the scheme. And, although old members left and new members joined, the structure of **WHITE ROCK** remained constant throughout the time period alleged and continued throughout scores of criminal acts. The structure of the enterprise furnished the means and method for the commission of the crimes, a "system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses."

55.     In addition, for the same reasons, except for juridical personhood, **WHITE ROCK PARTNERS** was an association-in-fact RICO enterprise, the **WHITE ROCK PARTNERS CRIMINAL ENTERPRISE**.

56.     **WHITE ROCK** would perpetrate its scheme through one, some, or all of (i) on its own, with its own brokers; (ii) by agreement with other firms and brokers within those firms, such agreements for the most part with **BLAIR** and **PALAGONIA**, respectively; and (iii) by collusion and cooperation with insiders of the companies whose securities were manipulated.

57.     For example, among the securities fraudulently sold by **WHITE ROCK** to the public were those of Holly Products, Inc. ("**HOLLY**") and U.S. Bridge of New York, Inc. ("**USBNY**").

58.     **HOLLY**, in Moorestown, New Jersey, was in the business of manufacturing tables and cabinets for the gaming industry and custom-built equipment for hospitals and long-term care facilities. **HOLLY's** chairman and chief executive officer, also a substantial shareholder of **HOLLY**, colluded and cooperated with the **WHITE ROCK PARTNERS**. ¶62.

59.     **USBNY**, a construction company in Queens, New York, was a subcontractor on public infrastructure projects in the New York area.  Its president and principal shareholder, an associate of the Gambino Family, colluded and cooperated with the **WHITE ROCK PARTNERS**. ¶62.

60.     From in or about March 2003 to October 1996, **THE WHITE ROCK PARTNERS**, by means of using **WHITE ROCK**, and their co-fraudfeasors there, together and by agreement with **PALAGONIA**, by means of using **BLAIR** with his co-fraudfeasors there, and with others, devised, implemented, and oversaw fraudulent schemes to manipulate the price of **HOLLY** and **USBNY** securities and fraudulently induce investors to buy and hold them (as a unitary buy-and-hold schemes of fraudulent inducement). Each of the schemes followed a similar pattern.

61.     **THE WHITE ROCK PARTNERS** and **PALAGONIA**, by means of using **WHITE ROCK** and **BLAIR** with their co-fraudfeasors in each, and with others, secretly acquired ownership and control of substantial blocks of securities of **HOLLY** and **USBNY** through various methods, including the private sale of securities to off-shore and domestic nominees prior to public offerings who then concealed their ownership and control by, among other means, depositing the securities in brokerage accounts at **WHITE ROCK** and other firms that had been opened in the name of nominees, including off-shore shell companies created for this purpose.

62.     In furtherance of these efforts, **THE WHITE ROCK PARTNERS** entered into undisclosed agreements with individuals associated with **HOLLY** and **USBNY**. Pursuant to these agreements, **THE WHITE ROCK PARTNERS** secretly agreed to compensate such individuals, including company officers, by allocating to them a portion of the profits from the fraudulent sale of securities.

63.     After they gained secret control over the securities of **HOLLY** and **USBNY**, **THE WHITE ROCK PARTNERS**, with others, created artificial market demand for the securities. One technique used to create such artificial demand was the payment of substantial undisclosed commissions, as much as 50 percent of the price of the securities, to induce brokers to recommend and sell **HOLLY** and **USBNY** securities to investors. Brokers at **WHITE ROCK**, **PALAGONIA** at **BLAIR**, and brokers at other firms received such payments, which payments, and the resulting creation of artificial market demand, were not disclosed to the public.

64.     When the price of **HOLLY** and **USBNY** securities rose as a result of artificial demand, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sold their secretly held or controlled securities to unwitting customers of **WHITE ROCK**, **BLAIR**, and other firms. **THE WHITE ROCK PARTNERS**, **BLAIR**, and others, obtained tens of millions of dollars in proceeds through these schemes.

65.     **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sought to maintain the artificially high price of the **HOLLY** and **USBNY** securities, among other companies, so that (i) they could continue to sell the securities they secretly controlled at these inflated prices, (ii) their unlawful schemes would go undetected, and (iii) a large number of customers at **WHITE ROCK**, **BLAIR**, and other brokerage firms could be tapped for future sales of artificially inflated securities. **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, artificially maintained the inflated price of securities by various techniques designed to insulate the securities from regular market forces, which would ordinarily cause the price of the stock and warrants to collapse due to the lack of genuine demand. These techniques included (i) false and misleading statements to persuade customers not to sell the securities; (ii) purposely

falling to take and execute customer orders to sell the securities; and (iii) executing a sale of the securities only if the sale could be matched, or "crossed," with a corresponding purchase of the same securities by another investor. None of these techniques was disclosed to investors.

66.    Again, it must be emphasized that since the whole concept of a "pump and dump" scheme is to push up securities prices to artificial highs, then keep them there long enough for the fraudfeasors and their associates to get out, the allegations herein that customers who had bought the securities were given false and fraudulent material information, as well as having true and correct material information withheld from them, as part of this scheme, that is, the allegations herein a tactic of "fraudulently inducing customers to hold," are made strictly in the context of, and as part of, the unitary fraudulent scheme, that while there were individual cases of course of implementing the tactic of fraudulently inducing this or that customer to hold, at all times those tactics were used strictly as part of the single, intentionally fused scheme of fraudulently inducing both the purchase and the hold as one coherent objective.

67.    When **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sold their **HOLLY** and **USBNY** securities at artificially inflated prices, their profits were laundered through various domestic and off-shore bank accounts. The proceeds were typically electronically transferred from domestic brokerage accounts to various off-shore nominee bank accounts, and in turn transferred to other off-shore bank accounts designated and controlled by members of the Enterprise, who in return provided a corresponding amount of cash, less a money laundering fee, to **THE WHITE ROCK PARTNERS**, a portion of which was used to make undisclosed payments to brokers who sold **HOLLY** and **USBNY**. By means of these off-shore

companies and accounts, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, concealed and promoted fraudulent securities transactions.

68.     Again, for the avoidance of ambiguity, although these criminal acts of money laundering may be otherwise identified as their own crimes, as for example of necessity there were thousands of acts of mail and wire communications crossing through interstate commerce to support the scheme, each thus an act of mail and wire fraud, nevertheless the money laundering, mail and wire fraud, and all similar acts were subordinate to and in furtherance of the scheme itself, to earn money through fraud in the purchase or sale of securities.

69.     Accordingly, between approximately March 1993 and October 1996, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, with others including **BLAIR**, constituted an association-in-fact RICO enterprise, the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE**.

70.     Others associated with or employed by the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE** included:

70.1.   Brokers and cold callers at other firms who fraudulently sold stock to investors.

70.2.   Persons who, through their affiliations with **HOLLY** and **USBN**, provided "product," i.e. securities for **WHITE ROCK** and other firms to sell fraudulently.

70.3.   Persons who acted as nominees by whom **THE WHITE ROCK PARTNERS** and others concealed their ownership of and interest in **USBNY** securities, which were fraudulently sold to the public, who laundered the proceeds of fraudulent securities sales through, among other means, the transfer of funds to off-shore bank accounts, and conducted secret transactions which furthered the fraudulent sale of **USBNY** securities.

70.4.   Members of the Bonanno, Genovese, and Colombo Families, including Colombo associate Daniel Persico, a close friend of **LAURIA's**, and Genovese soldier, Montevecchi, who, at the same time, was providing muscle to **SATER's** father's extortion ring, ¶13, and to Rosario Ganji, a Genovese captain orchestrating similar frauds at broker Meyers Pollock. These members of La Cosa Nostra (the "Mafia") employed by or associated with the Enterprise resolved disputes as to hiring and retaining brokers, as to extortion and attempted extortion of employees or associates of the Enterprise, and as to concerted efforts to reduce the price of securities underwritten by **WHITE ROCK** through techniques like "short selling." In return, persons employed by or associated with the Enterprise paid them in securities and cash proceeds of the fraudulent sale of securities.

## ALLEGATIONS COMMON TO ALL RICO ENTERPRISES

71.   Each RICO enterprise hereinabove defined operated in the Southern District of New York, elsewhere in the United States, and abroad, and engaged in, and its activities affected, interstate and foreign commerce.

72.   The chief purpose of each RICO enterprise was to obtain money for its members and associates by perpetrating related pattern acts of fraud in connection with the sale of securities, including unitary schemes of fraudulent inducement to buy and hold, and to accomplish this by acquiring secret control over large blocks of securities, then artificially inflating and maintaining the price of these securities by means of material misrepresentations and omissions and manipulative sales practices. After inflating the price of the securities, individuals employed by

and associated with the Enterprise sold their secretly controlled securities to the public, generating millions of dollars illicit profits. These profits were then laundered through numerous off-shore and other nominee accounts.

## PLAINTIFFS' INJURIES

73.     **PALAGONIA** so often traded the **GOTTDIENERS'** accounts without authority, refused to trade when ordered to, and caused others in his firm to do both, that he, and through him **BLAIR**, became fiduciaries to the **GOTTDIENERS** by exercising discretionary control.

74.     The frauds below, and individual predicate acts a part thereof, began in or about 1995 and continued occurring again and again through and into 1998.

75.     <u>Trading Losses</u>. The **GOTTDIENERS** sustained trading losses of $2,100,000 as a result of **PALAGONIA's** unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were fraudulently induced, caused, and led to unitarily purchase and hold securities, the losses they thereafter suffered the direct proximate result thereof such fraud.

76.     <u>Commission Losses</u>. The **GOTTDIENERS** sustained losses of $5,000,000 as a result of **PALAGONIA's** unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were unknowingly caused to pay that amount as (undisclosed) commissions so outrageously marked up as to be *per se* fraud pursuant to SEC regulations and the "shingle rule."

77.    Fees and Expenses Losses. The **GOTTDIENERS** sustained losses of $800,000 in legal fees and expenses ("legal fees as damages") incurred as a direct and proximate result of **PALAGONIA's** unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were caused to incur those expenses or liability therefor, even if non-recourse, in earlier attempts to vindicate their rights.

78.    These securities included stocks, warrants, and other securities of **HOLLY**, **USBNY**, and other issuers including Advanced Aeronautics, Advanced Tissue Sciences, Amerigon, Applied Laser Systems, Aquacare Systems, Bradley Pharmaceuticals, Cypros Pharmaceuticals, Digital Transfer Systems, Digital Video Systems, Ecocath, Food Court, Infosafe, Innovir Labs, Interactive Flight, Interneuron Pharmaceuticals, Intgo Processing Equipment, Lightpath Technologies, Linda's CHK, Microcarb, Mountbatten, Monaco Finance, Natural Earth Technologies, San Siro, Oncorx, Paperclip Imaging, Premier Laser Systems, Skysat Communications, Sulberger & Graham, Supervision, Telepad, Titan Pharmaceuticals, US China, US Diagnostic Labs, US Home & Garden, Video Update.

79.    On December 10, 2012, on application and with the agreement of the U.S. Attorney, EDNY, in *United States v. Coppa et al.*, 00-CR-0196, the Hon. I. Leo Glasser found that the Gottdieners, having previously been determined to be federal crime victims, were entitled to restitution of $1,300,000 in respect of their **HOLLY** and **USBNY** losses on account of **PALAGONIA's** criminal conduct in the conduct of, or participation in the conduct of, the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE** and Ordered such. Exh. D.

80.    At various times and dates, the Hon. R. Owen, SDNY, has ordered the **GOTTDIENERS** due judgments totaling about $2,200,000 in losses, including such fees.

81.     The **GOTTDIENERS** have received, directly or indirectly, payments in excess of $1,000,000 by third parties which offset certain of their losses.

82.     The **GOTTDIENERS** claim money damages to be determined at trial by the paradigm that they should be entitled to recover treble their entire directly and proximately caused losses, brought forward from the time incurred to date of judgment herein to compensate for the time value of money, less amounts received to date (the subtraction to be performed after trebling) to the extent, if at all, the law demands such offsets be made as opposed to applying the collateral source rules, and then such offsets to be made only and to the extent such amounts received have been earmarked, for example, denoted and accepted as so much on account of fees, etc.

83.     As to the time value of money, the **GOTTDIENERS** claim entitlement to the use of the "well managed account theory" for trading and commission losses incurred, that is, for losses which depleted their accounts at **BLAIR**, and prejudgment interest for all other losses, including legal fees as damages, (in all cases as well as trebling) given the egregious delays in obtaining justice and the time in which **SATER** and **LAURIA** have had use of their money. As to interest and the computation thereof, the **GOTTDIENERS** request such be given the jury to determine.

84.     The **GOTTDIENERS** claim punitive damages in an amount not less than $15,000,000, or $1,000,000 per year of concealment, separate and apart from trebling, in that trebling is to be deemed primarily compensatory and thus not to replace punitive damages in appropriate cases.

85.     The **GOTTDIENERS** claim the costs of and legal fees for and in respect of bringing this action, either by multiplying the total recovery by 1.67 to reflect the contingency fee herefor or by applying a rate of $750 multiplied by a contingency factor of 2.5.

86.     The **GOTTDIENERS** claim all other remedies and relief of kind and nature, whether equitable or legal, and in such amounts, as may be determined by this court insofar as such are deemed just and proper, provided, however, that the **GOTTDIENERS** wish to give maximum possible effect to delegate the determination of such questions of fact as may exist to the jury.


## CLAIMS


87.     Plaintiffs repeat and reallege the contents of ¶21 through the paragraph preceding this paragraph as if fully repeated and thereupon set forth herein.

88.     Defendants **SATER** and **LAURIA** are liable, and each of them jointly and severally, for all damages and other relief according to these alternative pleadings:


**Alternate A – Violation of Substantive RICO**

89.     Plaintiffs were proximately injured as set forth above by **PALAGONIA's** conduct or participation in the conduct of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE** in violation of 18 USC §1962(c).

90.     These losses include not only losses on **HOLLY** and **USBNY** but on all other securities in respect of which Plaintiffs were proximately injured, the frauds causing those injuries committed within the scope of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE**.

91.	Defendants are thus liable to Plaintiffs for violation of §1962(c) in that they, and each of them, alone or in common action in concert, conducted or participated in the conduct of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE**.

92.	That is, in other words, Defendants engaged in a pattern of securities frauds in aid and abettance of and common enterprise and concert with **PALAGONIA**, conducted by enterprise corruption, and are liable. But be clear, this is not a claim for violation of 10(b) or 10(b)5 per se, rather for violation of RICO in that the co-racketeers operated the RICO enterprise to perpetrate fraud in connection with the purchase and sale of securities in such fashion that they are liable for such behavior in RICO regardless whether they would be in securities fraud.

**Alternate B – Violation of Conspiracy RICO**

93.	Plaintiffs were proximately injured as set forth above by **PALAGONIA's** conduct or participation in the conduct of either or both (i) the **D. H. BLAIR CRIMINAL ENTERPRISE**; or (ii) the **PALAGONIA CRIMINAL ENTERPRISE**; in violation of 18 USC §1962(c).

94.	The Defendants, and each of them, alone or in common action in concert, agreed to further the operation of the **D. H. BLAIR CRIMINAL ENTERPRISE** or the **PALAGONIA CRIMINAL ENTERPRISE**. ¶63.

95.	The Defendants, and each of them, alone or in common enterprise, committed at least one overt act of racketeering which was a predicate crime, indeed many of them, in their actions in concert with the enterprise in pumping and dumping at least the securities of **HOLLY** and **USBNY**, causing injury to Plaintiffs.

96.     That is, the Defendants did conspire together with at least PALAGONIA not only in furtherance of, but in actual implementation of, PALAGNOIA's racketeering.

97.     Wherefore, liability is asserted against both Defendants for violation of §1962(d), and for all Plaintiff's losses to the **D. H. BLAIR CRIMINAL ENTERPRISE** or the **PALAGONIA CRIMINAL ENTERPRISE**.

98.     That is, in other words, Defendants agreed to (and did, see Alternate A) aid and abet **PALAGONIA's** securities frauds, which **PALAGONIA** committed through enterprise corruption, and in doing so Defendants committed numerous predicate crimes, their commission of which injured Plaintffs. See ¶92 for emphasis that this is not a claim in securities fraud for conspiracy to commit same, but is a claim for conspiracy to violate RICO laws where the existing RICO enterprise is engaged in fraud in connection with the purchase and sale of securities.

## AD DAMNUM

99.     Wherefore, Plaintiffs pray damages in the amount of $100,000,000, plus costs and attorneys' fees, plus all such other relief at law or in equity this court may decide just and proper.

100.    Plaintiffs respectfully notice the court of the significant possibility they will seek to modify this pleading into a class action in behalf of all victims everywhere similarly situated, especially who were never told of **SATER** and **LAURIA's** liability, in which case the common issues predominating are likely to create claims into the billions.

## SIGNATURE BLOCK

Dated March 18, 2013

**THE LAW OFFICE OF FREDERICK M. OBERLANDER P.C.**

_____

by Frederick M. Oberlander
Attorneys for Plaintiffs

Post Office Box 1870
28 Sycamore Lane
Montauk, NY 11954
212.826.0357  Tel.
212.202.7624  Fax.
fred55@aol.com

**THE LAW OFFICE OF RICHARD E. LENER P.C.**

_____

by Richard E. Lerner
*Of Counsel*