UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
:
ESTATE OF ERNEST GOTTDIENER, *et al.*,    :
                                    Plaintiffs,    :
                                               :          13 Civ. 01824 (LGS)
                 -against-                      :
                                               :          OPINION AND ORDER
FELIX SATER, *et al.*,                          :
                                    Defendants.  :
                                               :
-------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

On March 18, 2013, Plaintiffs commenced this civil suit against Defendants for violations

of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  On August 2, 2013,

Plaintiffs filed the First Amended Complaint (the "Complaint").  The case is now before this

Court on Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6),

filed on August 29, 2013.  For the reasons stated below, Defendants' motion is granted.

**BACKGROUND**

**I.     Factual Background**

The following facts are taken from the Complaint and accompanying exhibits except as

otherwise noted.

**A.     Palagonia & D.H. Blair & Co.**

Plaintiffs are Ervin Tausky, Suan Investments and the estates of Ernest and Judit

Gottdiener.[1]  (Compl. ¶¶ 48-50).  In the 1990s, Plaintiffs invested their money with Alfred

---

[1] Both Gottdieners are deceased.  (Compl. ¶ 48).  Suan Investments is a Gottdiener family
business, and Tausky is Judit Gottdiener's brother.  (Compl. ¶¶ 49-50).  All had accounts with
Blair, but most of the securities in Tausky's accounts were transferred to Suan Investments.
(Compl. ¶ 103).  These individuals will be referred to as Plaintiffs herein, even though the
Gottdieners are represented by their estates.

Palagonia, a non-party who was a broker with D.H. Blair & Co. Inc. ("Blair").  (Compl. ¶¶ 1, 72).  Between 1995 and 1998, Palagonia frequently traded Plaintiffs' accounts without authority, causing them to purchase and hold securities as part of a scheme to defraud (Compl. ¶¶ 11, 141-42), particularly securities of U.S. Bridge of New York, Inc. ("USBNY") and Holly Products, Inc. ("Holly").  (Compl. ¶¶ 12, 38, 125).  As a result, Plaintiffs sustained $2.1 million in trading losses, $5 million in commission losses and $800,000 in legal fees and expenses, for a total of $7.9 million.  (Compl. ¶¶ 143-45).  In the federal criminal case against Palagonia and others, the court found that Plaintiffs were entitled to restitution of $1.3 million from Palagonia on account of his criminal conduct.  (Compl. ¶ 147).  A copy of the restitution order is attached as Exhibit D to the Complaint.  Plaintiffs also have won judgments totaling $2.2 million and received more than $1 million from third parties to offset their losses.  (Compl. ¶¶ 148-49).

By the 1990s, Blair, once a well-known national investment firm, had become an operation set up for the fraudulent sale of new issues and their manipulation in the aftermarket. (Compl. ¶ 105).  Palagonia was the head of a group of brokers at Blair – referred to in the Complaint as the "Palagonia Group" or the "Palagonia Group Criminal Enterprise," an "association-in-fact RICO enterprise" – that perpetrated a "pump and dump" scheme, in which the brokers obtained control over large blocks of speculative small cap securities, artificially inflated their prices with manipulative, high-pressure sales tactics, and then unloaded their positions to reap the profits.  (Compl. ¶¶ 102, 106-08, 116).  The Complaint names 37 issuers of these securities, including USBNY and Holly.  (Compl. ¶ 146).  The brokers' tactics included fraudulently representing the viability of the stocks, omitting risks in their sales presentations and falsely claiming to possess inside information.  (Compl. ¶ 108).  To induce potential customers to open accounts and existing customers to hold onto their stock despite losses, the brokers

promised the customers future allocations of new issues as riskless investments.  (Compl. ¶ 109).

To maintain the artificially inflated prices of the securities, the brokers followed a "no net-sales

policy," in which brokers directed by their customers to sell would do so only when they could

find matching buy orders.  (Compl. ¶ 110).  The brokers never informed their customers about

this policy prior to their purchases, and on occasion accepted purchase orders in spite of the fact

that they contained pre-set sell instructions.  (Compl. ¶ 112).  This policy was enforced internally

by Blair's Chairman, Blair's head trader and Palagonia, who deprived noncompliant brokers of

allocations to future new issues.  (Compl. ¶ 112).  The Palagonia Group of brokers engaged in

this scheme under the supervision of Palagonia and in coordination with Blair's Chairman and

Vice Chairmen, in an arrangement that the Complaint refers to as the "D.H. Blair Criminal

Enterprise."  (Compl. ¶¶ 105, 107, 113).

In 2001, Palagonia pleaded guilty to state and federal charges.  The Complaint suggests

that his federal guilty plea encompassed racketeering activity, including the "pump and dump"

scheme as to the USBNY and Holly stocks.  (Compl. ¶40, Exs. I, J).  However, the federal

indictment and the transcript of his guilty plea, appended to the Complaint as Exhibits I and M,

make clear that Palagonia's federal plea did not include a racketeering charge or involve Holly

stock.  In fact, Palagonia pleaded guilty to one count of securities fraud conspiracy and one count

of money laundering conspiracy, both as part of the "pump and dump" scheme involving only

USBNY stock.  (Compl. Exs. I, M).  It is unclear what his state plea encompassed.

The Complaint further alleges that in a 2011 deposition, Palagonia testified that he was

bribed by White Rock Partners & Co., Inc. ("White Rock") to "pump" Holly and USBNY stock

and that Plaintiffs were direct victims of the scheme as to those stocks.  (Compl. ¶ 38).  Excerpts

from the deposition, appended as Exhibit L to the Complaint, show that Palagonia testified that

he "str[uck] a deal with [Defendant] Sal[vatore] L[au]ria that [he] was going to buy those two stocks and . . . place them with clients" in return for cash payments from Defendant Lauria (Compl. Ex. L, at 17); that Palagonia agreed in his testimony that he did "the same thing . . . with regard to the [USBNY] stock [he] did with regard to the Holly Products stock" (Compl. Ex. L, at 16); and that he also agreed that "the judgment creditors in this case were [his] victims" regarding the USBNY and Holly stocks (Compl. Ex. L, at 42-43).

### B.    Defendants & White Rock Partners & Co., Inc.

Defendants Lauria and Felix Sater were partners at White Rock, a registered securities broker-dealer that operated from 1994 to 1996.  (Compl. ¶¶ 117-18).  White Rock operated for the primary purpose of profiting from a "pump and dump" scheme that "often involv[ed] the same securities as[] the Blair 'pump and dump' scheme . . . ."  (Compl. ¶ 120).

White Rock fraudulently sold to the public the stocks of Holly and USBNY, among others.  (Compl. ¶ 125).  The partners at White Rock (the "White Rock Partners"), including Defendants, secretly acquired control over large blocks of the shares of Holly and USBNY by agreeing to compensate individuals associated with the two companies with the proceeds of their eventual fraudulent sale.  (Compl. ¶¶ 129-30).  These shares were held by nominees that concealed their ownership by, *inter alia*, depositing the securities in accounts at White Rock. (Compl. ¶ 129).  White Rock Partners drove demand for the securities by paying undisclosed commissions – up to half of the selling price – to brokers at White Rock, Blair and other firms for selling Holly and USBNY shares.  (Compl. ¶ 131).  To insulate the inflated prices of the securities from market forces, White Rock Partners, Palagonia and others made false representations to customers to dissuade them from selling and willfully failed to execute sell orders unless they could be matched with corresponding buy orders.  (Compl. ¶ 133).  They then

sold their own shares at the inflated prices, making tens of millions of dollars in proceeds. (Compl. ¶ 132).  The proceeds were laundered through offshore nominee bank accounts that then paid cash to White Rock Partners.  (Compl. ¶ 135).

The Complaint alleges that the foregoing facts demonstrate the existence of an entity that Plaintiffs call the "White Rock-Blair Criminal Enterprise," comprised of White Rock Partners, Palagonia and other brokers at Blair.  (Compl. ¶ 137).  According to Plaintiffs, the White Rock-Blair Criminal Enterprise also encompassed brokers at other firms, individuals associated with Holly and USBNY, those who participated in the laundering of the scheme's proceeds, and members of the Bonanno, Genovese and Colombo crime families.  (Compl. ¶¶ 138.1-4).

In 1998, Defendants pleaded guilty to federal racketeering charges and alleged predicate acts of securities fraud, including the "pump and dump" scheme as to Holly and USBNY stocks. (Compl. ¶ 41).  Specifically, Defendants each pleaded guilty to one RICO violation, including predicate acts of securities fraud regarding the USBNY and Holly stocks.  (Compl. Exs. E-F). Defendant Lauria was sentenced on February 5, 2004, and Defendant Sater was sentenced on October 23, 2009, after a period of cooperation with the federal government.  (Compl. ¶¶ 76, 93, Exs. G-H).  The criminal Informations to which Defendants pleaded guilty, the judgments against them and Defendant Sater's sentencing transcript are appended to the Complaint as Exhibits E through H and N.

The Complaint alleges that, although Defendant Lauria's conviction became final in 2004, it "was hidden from the public by the Eastern District of New York federal court and not available to the public until it was 'unhidden'" (Compl. ¶ 31); and that Defendant Sater's "entire case, including his sentencing, was concealed for 15 years, illegally as we now know" (Compl. ¶ 74).  The enforcement of Judge I. Leo Glasser's sealing orders in the criminal cases and the

eventual unsealing of the documents in question were exhaustively litigated before Judges

Glasser and Brian Cogan in the Eastern District of New York as well as multiple times in the

Second Circuit.  On March 12, 2013, Judge Glasser unsealed a substantial number of documents

in the criminal case against Defendant Sater, some of which are now exhibits to the Complaint.

Plaintiffs filed this action approximately one week later.

## II.    Plaintiffs' Claims

Based on the facts above, Plaintiffs bring two claims against Defendants Sater and

Lauria: a violation of substantive RICO, 18 U.S.C. § 1962(c), and a RICO conspiracy in

violation of 18 U.S.C. § 1962(d).  (Compl. ¶¶ 155-66).  Plaintiffs bring the substantive RICO

claim against Defendants for their own participation in the conduct of the White Rock-Blair

Criminal Enterprise, predicated on Defendants' aiding and abetting Palagonia's securities fraud.

(Compl. ¶¶ 5, 8.4.1, 9, 160).  Alternatively, Plaintiffs bring a conspiracy RICO claim against

Defendants for their agreement to further the operation of the D.H. Blair Criminal Enterprise or

the Palagonia Group Criminal Enterprise, predicated on Palagonia's acts of securities fraud.

(Compl. ¶¶ 6, 8.4.2, 9, 166).  Plaintiffs seek treble damages under RICO, as well as punitive

damages and legal fees.  (Compl. ¶¶ 150-53).


## STANDARD

On a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and

draws all reasonable inferences in favor of the non-moving party.  *See Famous Horse Inc. v. 5th

Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).  To withstand dismissal, a pleading "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. While "'detailed factual allegations'" are not necessary, the pleading must be supported by more than mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  Rule 8 of the Federal Rules of Civil Procedure "requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (alteration in original) (quoting *Twombly*, 550 U.S. at 555), *cert. denied*, 133 S. Ct. 846 (2013).  Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal quotation marks omitted); *see also* Fed. R. Civ. P. 8(a)(2).

A RICO claim must allege every essential element of each predicate act.  *See, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (dismissing a RICO claim where the complaint failed to plead predicate acts of mail fraud with particularity).  Where the alleged predicate acts are frauds, a plaintiff must "state with particularity the circumstances constituting fraud" pursuant to Federal Rule of Civil Procedure 9(b).  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) ("[T]he heightened pleading standards of Fed. R. Civ. P. 9(b) . . . also appl[y] to allegations of fraudulent predicate acts supporting a RICO claim." (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts[ ] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."))).  Particularity under Rule 9(b) requires

the plaintiff to "'allege the time, place, speaker and sometimes even the content of the alleged misrepresentation.'"  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 579 (2d Cir. 2005) (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)).

The Complaint includes 14 exhibits.  Rule 10(c) of the Federal Rules of Civil Procedure provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Moreover, "it is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6) . . . ."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *see also Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  District courts in this Circuit have frequently observed, however, that "'RICO is a specialized statute requiring a particular configuration of elements[, which] cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint.'"  *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 464 n.76 (E.D.N.Y. 2007) (quoting *Lesavoy v. Lane*, 304 F. Supp. 2d 520, 532 (S.D.N.Y. 2004), *aff'd in relevant part sub nom. Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721 (2d Cir. 2006)); *accord Sobek v. Quattrochi*, No. 03 Civ.10219, 2004 WL 2809989, at *4 (S.D.N.Y. Dec. 8, 2004); *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606, 2004 WL 2187069, at *5 (S.D.N.Y. Sept. 29, 2004).  "'Parroting statutory language while generally referring the reader back to the previous 100 paragraphs in a complaint is inadequate.'"  *Id.* (quoting *Lesavoy*, 304 F. Supp. 2d at 532).  Similarly, making general allegations and then referring the reader to voluminous appended exhibits is also inadequate.

**DISCUSSION**

**I.      The RICO Amendment to the PSLRA**

On the facts, Plaintiffs' RICO claims are in substance claims for aiding and abetting

securities fraud.  They allege that Defendants bribed Palagonia, a securities broker and non-

party, to make fraudulent sales of securities to Plaintiffs.  However, as Plaintiffs acknowledge in

the Complaint, the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate*

*Bank of Denver, N.A.* forecloses them from directly asserting a claim for aiding and abetting

securities fraud under § 10(b).  (Compl. ¶¶ 18, 22).  511 U.S. 164 (1994).  Plaintiffs admit that

they seek to sidestep this problem by instead asserting RICO claims under the "conviction

exception" of 18 U.S.C. § 1964(c), alleging a substantive RICO violation with predicate acts of

aiding and abetting securities fraud or in the alternative a RICO conspiracy alleging facilitation

of a non-party's securities fraud.  (Compl. ¶¶ 22-24).

Section 1964(c), which creates private civil causes of action under RICO, provides:

> Any person injured in his business or property by reason of a [RICO] violation
> . . . may sue therefor . . . and shall recover threefold the damages he sustains and
> the cost of the suit, including a reasonable attorney's fee, *except that no person*
> *may rely upon any conduct that would have been actionable as fraud in the*
> *purchase or sale of securities to establish a violation of section 1962.  The*
> *exception contained in the preceding sentence does not apply to an action*
> *against any person that is criminally convicted in connection with the fraud* . . . .

18 U.S.C. § 1964(c) (emphasis added).  The bar against using securities fraud as a predicate act

for civil RICO claims was added to § 1964(c) as part of the Private Securities Litigation Reform

Act (the "PSLRA").  Congress enacted the PSLRA in 1995 in recognition of "'the need to reduce

significantly the filing of meritless securities lawsuits without hindering the ability of victims of

fraud to pursue legitimate claims . . . .'"  *Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 219

(2d Cir. 2002) (quoting *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d

157, 166-67 (2d Cir. 1999)).  In line with that purpose, § 107 of the PSLRA, which amended §

1964(c) of the RICO statute by adding the italicized language above, was designed to "prevent

litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with

their threat of treble damages."  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274

(2d Cir. 2011) (internal quotation marks omitted); *see also* S. Rep. No. 104-98, at 19 (1995)

(quoting then-SEC Chairman Arthur Levitt's testimony that "[b]ecause the securities laws

generally provide adequate remedies for those injured by securities fraud, it is both unnecessary

and unfair to expose defendants in securities cases to the threat of treble damages and other

extraordinary remedies provided by RICO.").  Although the legislative history of the PSLRA

says nothing about the purpose of the criminal conviction exception to the securities fraud bar, it

is consonant with RICO's stated purpose of "seek[ing] the eradication of organized crime in the

United States" and its "infiltrat[ion] and corrupt[ion of] legitimate business . . . ."  Organized

Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922-23 (1970).

        The legislative history of the PSLRA, enacted one year after the Supreme Court's *Central

Bank* decision prohibiting private actions against aiders and abettors of § 10(b) violations, shows

that Congress was asked, and declined, to overturn *Central Bank*.  S. Rep. No. 104-98, at 19

(1995).  The Report by the Senate Committee on Banking, Housing and Urban Affairs stated that

the Committee "believe[d] that amending the 1934 Act to provide explicitly for private aiding

and abetting liability actions under Section 10(b) would be contrary to [the PSLRA]'s goal of

reducing meritless securities litigation."  *Id.*  Although the PSLRA does authorize the SEC to

bring suits against aiders and abettors of securities fraud, 15 U.S.C. § 78t(e), nothing in the

statute or legislative history suggests that Congress intended to reestablish a private cause of

action against secondary actors – i.e., those who assist rather than directly commit fraud in the

purchase and sale of securities.  It is against this backdrop that Plaintiffs' RICO claims must be viewed.

## II.    Plaintiffs' Substantive RICO Claim

In the first instance, Plaintiffs allege that Defendants conducted or participated in the conduct of the White Rock-Blair Criminal Enterprise through a pattern of aiding and abetting Palagonia's securities fraud in violation of 18 U.S.C. § 1962(c).  This claim is dismissed for three independent reasons.  First, it does not fall within the conviction exception to RICO's securities fraud bar.  Second, aiding and abetting securities fraud is not a proper predicate act under § 1961(1).  Third, the Complaint fails to plead with the requisite specificity under Rule 9(b) of the Federal Rules of Civil Procedure.

### A.    The Conviction Exception

Plaintiffs' substantive RICO claim predicated on aiding and abetting Palagonia's securities fraud fails because it is prohibited by RICO's securities fraud bar, 18 U.S.C. § 1964(c), and does not fall within the conviction exception to that bar.  The exception to the prohibition against civil RICO actions predicated on securities fraud applies only to actions against those who are "criminally convicted in connection with" that fraud.  18. U.S.C. § 1964(c).  Here, Plaintiffs allege Defendants' aiding and abetting of Palagonia's securities fraud as predicate acts underlying the substantive RICO claim.

However, Defendants were not convicted "in connection with" aiding and abetting Palagonia's securities fraud.  Defendants Sater and Lauria each pleaded guilty to one substantive RICO violation based on their operating White Rock, their own brokerage firm, as a racketeering enterprise to sell securities based on fraudulent statements and omissions.  Their methods and means were to acquire substantial blocks of securities sold in connection with IPOs underwritten

by White Rock; make payments to brokers at White Rock and other unnamed brokers at unnamed other firms to induce them to sell the remaining shares and thereby inflate and maintain the price of the shares; and then sell their own shares at a substantial profit.  In the criminal Informations to which Defendants pleaded guilty, five of the six predicate acts are securities fraud regarding five different securities, including Holly and USBNY.  The remaining predicate act is laundering the proceeds of the securities sales.  The securities fraud in each instance consists of Defendants' selling their own securities at inflated prices.

Nothing except surmise connects Defendants' criminal convictions with Palagonia or Plaintiffs.  Their criminal Informations do not mention Blair, Palagonia, or Plaintiffs Gottdieners, Tausky and Suan Investments.  As the Complaint notes, "[i]n the case at bar, for all we know (we don't), Defendants never heard of Plaintiffs until they got served with the initiating Complaint in this action."  (Compl. ¶ 25).  Particularly in light of the purpose of the RICO securities fraud bar to "prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases," *MLSMK*, 651 F.3d at 274, the Court declines to find that Defendants were convicted "in connection with" aiding and abetting Palagonia's fraud for purposes of § 1964(c).  *See Krear v. Malek*, 961 F. Supp. 1065, 1077 (E.D. Mich. 1997) (holding that "[u]nless the plaintiffs are named victims of the scheme to defraud in the information, this court cannot find that they have been criminally defrauded and are thereby entitled to invoke the 'conviction exception'" of § 1964(c)).  To hold otherwise could mean that anyone who purchased the five stocks named in Defendants' Informations during the relevant period for each security, together totalling more than five years, could bring a substantive RICO claim.

**B.**      **Aiding and Abetting as Predicate Act**

Even if Plaintiffs' substantive RICO claim against Defendants predicated on aiding and abetting securities fraud did fall within the conviction exception, the claim still fails because aiding and abetting securities fraud cannot serve as a RICO predicate act.  This is so for two reasons: to conclude otherwise (i) would be contrary to a plain reading of the statute, and (ii) would undermine the Supreme Court's holding in *Central Bank*.

Section 1964(c) of the RICO statute creates a private right of action for violations of § 1962.  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  To plead "a pattern" for § 1962(c) purposes, the complaint must allege at least two predicate acts of racketeering activity.  18 U.S.C. § 1961(5).  Section 1961(1) defines "racketeering activity" as various specified crimes, including "fraud in the sale of securities," § 1961(1)(D).

The Complaint does not allege that Defendants sold any securities to Plaintiffs or that Defendants themselves committed securities fraud.  Rather, with respect to the substantive RICO claim, the Complaint alleges that the predicate acts are "aiding and abetting and knowingly facilitating Palagonia's securities frauds," specifically by paying or bribing Palagonia to commit securities fraud.  (Compl. ¶¶ 5, 8.4.1).  Aiding and abetting securities fraud, however, is not racketeering activity under RICO.

First, as a matter of statutory construction, nothing in the language of § 1961(1), which defines "racketeering activity," suggests that aiding and abetting a predicate act itself constitutes a predicate act.  Moreover, § 1962(c), which is the basis for Plaintiffs' claim here, does not contain any references to aiding and abetting as a form of prohibited racketeering activity, and

instead makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity*."  18 U.S.C. § 1962(c) (emphasis added).  That absence stands in contrast to § 1962(a), a separate basis for RICO liability not alleged here, which makes it

> unlawful for any person who has received any income . . . from *a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code* [to use such income in connection with a racketeering enterprise].

18 U.S.C. § 1962(a) (emphasis added).  This provision specifically defines "participation" in a pattern of racketeering activity for its purposes to encompass aiding and abetting as defined by the general criminal aiding and abetting statute, 18 U.S.C. § 2.[2]  In noting the contrast between § 1962(a) and § 1962(c), the court in *Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)* observed, "Congress knows how to impose secondary liability when it chooses to do so . . . ."  924 F. Supp. 449, 476 (S.D.N.Y. 1996) ("*DED*").  The fact that Congress chose to impose secondary liability for § 1962(a) in explicit terms but did not do the same for § 1962(c) compels the inference that it intended to exclude aiding and abetting predicate acts as predicate acts for § 1962(c) purposes.

A second reason that aiding and abetting securities fraud is not a proper predicate act is the Supreme Court's decision in *Central Bank*.  That decision prohibits private plaintiffs from

---

[2] The general criminal aiding and abetting statute provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

holding aiders and abettors of § 10(b) violations civilly liable.  By implication, it also forecloses

civil RICO liability predicated on aiding and abetting securities fraud.  Although the question has

not been extensively litigated, the Court agrees with those decisions holding that civil RICO

claims cannot be based on predicate acts of aiding and abetting securities fraud, because to

conclude otherwise would impermissibly circumvent the holding in *Central Bank.  Accord*

*Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.*, No. 94 Civ. 118, 1998 WL 196212, at *1

(S.D.N.Y. Apr. 22, 1998) ("Although *Central Bank* did not specifically deal with RICO claims,

aiding and abetting liability [in connection with securities fraud] under RICO would seem to be

precluded by implication."); *Bowdoin Constr. Corp. v. R.I. Hosp. Trust Nat'l Bank, N.A.*, 869 F.

Supp. 1004, 1009 (D. Mass. 1994) ("[A]ny allegations of aiding and abetting securities fraud

cannot constitute predicate acts under RICO.  To hold otherwise would enable plaintiffs to use

RICO to circumvent the interpreted intent of [§ 10(b) in *Central Bank*]."); *Schultz v. R.I. Hosp.*

*Trust Nat'l Bank, N.A.*, No. 88 Civ. 2870, 1994 WL 326376, at *4 (D. Mass. May 24, 1994)

*aff'd*, 94 F.3d 721 (1st Cir. 1996); *cf. DED*, 924 F. Supp. at 475-77 (holding that private

plaintiffs may not bring civil RICO suits under § 1962 against aiders and abettors, and noting

that "[i]t would be particularly troublesome to infer aiding and abetting liability in a case . . .

where most of the predicate acts upon which the RICO claims are based are acts of securities

fraud" (citing *Bowdoin*, 869 F. Supp. at 1009)).[3]  *But see 131 Main St. Assocs. v. Manko*, 897 F.

Supp. 1507, 1529 n.20 (S.D.N.Y. 1995) (observing that "because *Central Bank* did not question

the government's right to criminally punish the aiding and abetting of such violations, it has no

---

[3] The *DED* case is among several cases that address the separate but closely related issue of
whether there is civil liability for aiding and abetting a § 1962 RICO violation, and holding that
there is not.  *See also Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248,
256 (S.D.N.Y. 1997); *Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356, 1997 WL 214957, at
*11 (S.D.N.Y. Apr. 29, 1997).

bearing on the question of whether plaintiffs have adequately alleged RICO predicate acts of aiding and abetting securities fraud" (citation omitted)); *Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 91 Civ. 2050, 1995 WL 43669, at *4 (S.D.N.Y. Feb. 2, 1995) ("[W]hether one commits 'racketeering activity' depends on whether one is criminally liable for a given act, not on whether one is civilly liable.").

As the courts in both *Bowdoin* and *DED* noted, to recognize aiding and abetting securities fraud as a RICO predicate act would create an unwarranted loophole to the *Central Bank* decision. *Bowdoin*, 869 F. Supp. at 1009; *DED*, 924 F. Supp. at 476-77. Such an outcome would encourage just the sort of "artful pleading to boot-strap securities fraud cases into RICO cases" that the PSLRA sought to reduce. *MLSMK*, 651 F.3d at 274.

In *Dayton* and *Manko*, the courts reached the contrary view that aiding and abetting securities fraud may serve as RICO predicate acts. They reasoned that RICO creates liability based on criminal predicate acts, and 18 U.S.C. § 2 provides that one who aids and abets a federal crime is liable as a principal. *Manko*, 897 F. Supp. at 1529 n.20; *Dayton*, 1995 WL 43669, at *4. However, "there is no suggestion that [§] 2, enacted in 1909, was intended to authorize civil liability for aiding and abetting in any situation in which Congress thereafter combined civil and criminal penalties in one statute, whether in RICO (enacted in 1970), the Securities Exchange Act (enacted in 1934), or elsewhere." Jed S. Rakoff, *Aiding and Abetting Under Civil RICO*, N.Y.L.J., May 12, 1994. As the court in *DED* pointed out, to hold otherwise would mean that the *Central Bank* holding is wrong. *DED*, 924 F. Supp. at 476-77.

Defendants argue that the Second Circuit decision in *MLSMK* supports their position. That decision, however, is inapposite. In the only Second Circuit case to address the § 1964(c) securities fraud bar, the *MLSMK* court affirmed the dismissal of a RICO conspiracy claim. In

16

that case, the defendants allegedly had furthered a non-party's racketeering enterprise predicated on wire fraud based on conduct that in substance was aiding and abetting securities fraud. *MLSMK*, 651 F.3d at 273-74 & n.9.  The court held that § 1964(c) bars all claims predicated on securities fraud, even those that are only actionable by the SEC, such as aiding and abetting securities fraud.  *Id.* at 280.  Although the court did not consider whether the result would have been different had the defendants been convicted in connection with the alleged fraud, nothing in the opinion undermines the continuing force of *Central Bank* or the statutory language of §§ 1961(1) and 1962(c).

Because aiding and abetting securities fraud cannot serve as a RICO predicate act, Plaintiffs have failed to allege the predicate acts necessary to constitute a pattern of racketeering activity for § 1962(c) purposes.  Consequently, Plaintiffs' substantive RICO claim fails.

## C.    Adequacy of the Pleadings

The Complaint fails to plead Defendants' alleged fraud with sufficient particularity for Rule 9(b) purposes.  The Complaint does not provide details such as "the time, place, speaker" or "the content of the alleged misrepresentation" with respect to the critical events underlying Plaintiffs' claim.  *Aetna*, 404 F.3d at 579.

The Complaint fails to detail how Palagonia allegedly defrauded Plaintiffs.  It does not allege, for any particular stock, which of the Plaintiffs bought it, on what date, what misrepresentations or omissions Palagonia made to induce that purchase, whether that Plaintiff was fraudulently induced to continue to hold that stock, or what misstatement or omission was made at the time.  (Compl. ¶ 11).  The Complaint uses the term "Plaintiffs" or "the Gottdieners"

to refer to all four Plaintiffs,[4] but this device does not excuse the required pleading.  The

Complaint attaches the federal indictment containing the two counts to which Palagonia pleaded

guilty – both counts involving only USBNY – and Palagonia's guilty plea, but neither document

names any of the Plaintiffs to connect them to Palagonia's wrongdoing.  (Compl. Exs. I, M).  A

restitution order and deposition testimony in what seems to be an action to enforce that order

lead to the inference that Plaintiffs were defrauded by Palagonia, but neither document provides

the essential allegations missing from the Complaint – what misrepresentations were made to

what Plaintiff regarding what stock and when.  (Compl. Exs. D, L).  Additionally, the Complaint

fails to give notice of the securities actually at issue.  While the Complaint initially references a

"dozen or so stocks," including USBNY and Holly by name (Compl. ¶ 12), it later states that the

securities at issue were the "stocks, warrants and other securities" of 37 listed issuers.  (Compl. ¶

146).

     Moreover, the Complaint stops short of  actually alleging that Palagonia fraudulently

induced his clients, including Plaintiffs, to purchase and hold securities of Holly and USBNY, in

consideration for improper payments he received from Defendants.  Instead, the Complaint

obscures the allegations by using the term "White Rock Partners," defined as Defendants Sater,

Lauria *and others*, rather than referring to Sater and Lauria by name or as Defendants.  (Compl. ¶

118).  Some allegations use the passive voice and avoid identifying the actor in the sentence.

Others refer vaguely to unnamed stocks and customers.  Still other allegations use the sentence

or paragraph structure to separate Defendants from the wrongdoing.  The result is that the

---

[4] The Complaint states that "[d]ue to the transfer of most of the securities in Tausky accounts to
Suan and the deaths of Ernest and Judit, and pursuant to a litigation agreement among *Plaintiffs*,
the losses for each must be viewed together and *Plaintiffs* will be considered in the aggregate as
'the *Gottdieners*.'"  (Compl. ¶ 103 (emphasis added)).

Complaint never alleges that Defendants paid Palagonia to fraudulently place USBNY and Holly stock with Plaintiffs, or even his clients generally, resulting in the sale to Plaintiffs.  For example, one of the few paragraphs connecting Palagonia, Defendants and the Holly and USBNY stocks (but not Plaintiffs) alleges:

> After [the White Rock Partners] gained secret control over the securities of Holly and USBNY, The White Rock Partners, with others, created artificial market demand for the securities. One technique used to create such artificial demand was the payment of substantial undisclosed commissions, as much as 50 percent of the price of the securities, to induce brokers to recommend and sell Holly and USBNY securities to investors. Brokers at White Rock, Palagonia at Blair, and brokers at other firms received such payments, which payments, and the resulting creation of artificial market demand, were not disclosed to the public.

(Compl. ¶ 131).  While the paragraph appears to offer details, a closer look reveals that it fails to specify *which* of the "White Rock Partners . . . created the artificial market demand for securities," *who* used the "one technique . . . to create such artificial demand," *who* made "the payment of substantial undisclosed commissions," *which* "investors" were sold the Holly and USBNY securities, and *from whom* Palagonia and others "received such payments."  Indeed, in the entirety of the Complaint, Defendant Sater is never mentioned in relation to any payment to Palagonia.  The Holly stock is mentioned only equivocally.  Nothing ties the unlawful payments to the sales that were made to Plaintiffs.

To the extent that these suggestive statements can be considered allegations, they are belied by the attachments to the Complaint.  For example, the Complaint makes much of Palagonia's federal guilty plea, and purports to characterize the contents of his guilty plea transcript.  (Compl. ¶¶ 8.1, 8.2.2, 8.3, 28, 37, 40).  The attached transcript, however, makes clear that Palagonia pleaded guilty to just two counts of the federal indictment, both dealing with USBNY and neither with Holly.  (Compl. Ex. M).  The referenced portion of the transcript, the

allocution, consists almost entirely of Palagonia answering "yes" to the judge's questions. Neither the questions nor Palagonia's answers identify Defendants Sater, Lauria or even White Rock by name, describe the methods and means of the conspiracy or any unlawful payments, name Plaintiffs or deal with the Holly stock.

Similarly, the Complaint bolsters its allegations by purporting to describe Palagonia's statements at a deposition.  (Compl. ¶ 38).  However, the transcript tells a much more equivocal story.  (Compl. Ex. L).  When asked, "Would you agree with me that the same thing that you did with regard to the U.S. Bridge stock you did with regard to the Holly Products stock," Palagonia answered "Yes."  When asked to elaborate, Palagonia answered, "What I remember is striking a deal with Sal L[au]ria that I was going to buy those two stocks . . . and that he would give me cash back for buying those stocks. . . . I would buy them and place them with clients."  (Compl. Ex. L, at 16-17).  When asked if the overall scheme would have the effect of fraudulently inflating the price of those stocks, he answered, "I remember that being the game plan, but I didn't know if I participated in that or if my responsibility was just, as they used to call it, finding a home for the initial block of stock."  (Compl. Ex. L, at 17).  When asked a similar question, he answered, "I bought the stock but I was not behind the – when you say 'the scheme', I was not the one running the scheme so I can't read their minds, but I can say that is normally the intent of the idea behind this."  (Compl. Ex. L, at 20).

The Complaint also relies on Defendants' guilty pleas, but overstates what they represent. (Compl. ¶ 3).  The Informations, but not the guilty plea transcripts, are appended as exhibits to the Complaint.  (Compl. Exs. E-F).  Each Information alleges one RICO violation with six predicate acts, one that is a Holly securities fraud and another that is a USBNY securities fraud. In each case, Defendants allegedly "paid substantial undisclosed compensation to brokers to

induce them to recommend and sell" Holly and USBNY securities.  (Compl. Ex. E ¶¶ 27, 31; Ex. F ¶¶ 27, 31).  However, even these allegations do not say that Defendants made the payments to Palagonia, nor do they connect the payments to any sale of securities that Palagonia made to Plaintiffs.

In sum, despite the apparent detail, the Complaint, taken together with its exhibits as required by Rule 10(c), does not and apparently cannot plead that Defendants Sater and Lauria paid Palagonia to fraudulently place USBNY and Holly stock with Plaintiffs.  Consequently, Plaintiffs' substantive RICO claim fails to satisfy Rule 9(b) and its particularity requirement, and must be dismissed.

## III.    Plaintiff's Conspiracy RICO Claim

In the alternative to their substantive RICO claim, Plaintiffs allege a RICO conspiracy – that Defendants "agreed to further the operation of the D.H. Blair Criminal Enterprise or the Palagonia Criminal Enterprise" in violation of the conspiracy RICO provision, 18 U.S.C. § 1962(d).  (Compl. ¶ 162).  The conspiracy RICO claim is based on the same facts as the substantive RICO claim, and is pleaded as an alternative theory of liability.  The Complaint alleges that Defendants conspired with Palagonia to further Palagonia's RICO violation. (Compl. ¶ 8.4.2).  Accordingly, the predicate acts are Palagonia's substantive violations of the securities laws.  (Compl. ¶ 166).  The alleged overt acts are the payments or "bribes" Defendants allegedly made to Palagonia.  (Compl. ¶ 8.4.2).

Plaintiffs' conspiracy RICO claim fails for the same three reasons that the substantive RICO claim must be dismissed.  First, the conviction exception to RICO's securities fraud bar is inapplicable.  Just as Defendants were not convicted in connection with aiding and abetting

Palagonia's securities fraud, neither were they convicted in connection with Palagonia's securities fraud itself.

Second, given the conspiracy RICO claim's reliance on factual allegations that are the same as those underlying the substantive RICO claim, the conspiracy RICO claim is likewise fatally deficient with respect to particularity under Rule 9(b).

Finally, the conspiracy claim, like the substantive aiding and abetting claim, is an improper effort to circumvent the Supreme Court's holding in *Central Bank*. The Second Circuit has held that the *Central Bank* prohibition extends to private actions against conspirators of § 10(b) and Rule 10b-5 violations. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841 (2d Cir. 1998). It would be exceedingly odd if, because of *Central Bank* and its progeny, Plaintiffs could not bring claims for aiding and abetting securities fraud, conspiring to commit securities fraud or substantive RICO based on predicate acts of aiding and abetting securities fraud, yet on identical facts could make out a claim for conspiracy to commit RICO with its potential for treble damages. As with Plaintiffs' substantive RICO claim, the Complaint seeks to evade this limitation on secondary liability under the federal securities laws by pleading a conspiracy RICO violation. This cannot be a proper result. *Accord Sundial Int'l Fund Ltd.*, 1998 WL 196212, at *2 ("The [*Dinsmore*] opinion foreclosed private claims under § 10b and Rule 10b–5 for conspiracy to commit securities fraud. The opinion is based upon the holding of *Central Bank of Denver*. In light of this direction from the Court of Appeals, the court concludes that RICO claims for conspiracy, like those for aiding and abetting, cannot be made.").

For all of these reasons, the conspiracy claim is dismissed.

## IV.  Statute of Limitations

Both of Plaintiffs' claims are untimely with respect to Defendant Lauria.

22

The statute of limitations in civil RICO cases is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  Pursuant to § 1964(c), in RICO actions predicated on securities fraud, "the statute of limitations shall start to run on the date on which the conviction becomes final."  Criminal convictions generally do not become final until the imposition of the sentence.  *Flynt v. Ohio*, 451 U.S. 619, 620 (1981) ("Applied in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence.") (citing *Parr v. United States*, 351 U.S. 513, 518 (1956) ("Final judgment in a criminal case means sentence.  The sentence is the judgment." (internal quotation marks omitted))).  Although Defendant Sater was not sentenced until October 23, 2009, less than four years prior to Plaintiffs' commencement of this suit on March 18, 2013, Defendant Lauria was sentenced in February 2004, more than nine years before Plaintiffs brought suit.  Thus, any RICO claims that Plaintiffs may have had against Defendant Lauria expired in February 2008, more than five years before this suit was brought.

Plaintiffs argue that because Defendant Lauria's conviction and sentence were fraudulently concealed from the public until March 22, 2009, the limitations period should be equitably tolled until the conviction was unsealed.  Generally, the defendant carries the burden of showing that the plaintiff failed to plead timely claims, and dismissing claims on statute of limitations grounds at the complaint stage "is appropriate only if a complaint clearly shows the claim is out of time."  *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).  However, where the plaintiff invokes equitable tolling, "[t]he burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff."  *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).  In *In re Merrill Lynch Ltd. P'ships Litig.*, the Second Circuit held that under the doctrine of fraudulent concealment, the statute of limitations is equitably tolled if the plaintiff can

23

establish three elements: "(1) wrongful concealment by [defendant] Merrill Lynch, (2) which prevented [plaintiff] investors' discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim."  154 F.3d 56, 60 (2d Cir. 1998).  *Accord Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999).  Here, the Complaint does not allege the first prong – i.e., wrongful concealment caused by Defendant Lauria.

Because the Complaint shows that Plaintiffs' claim is clearly out of time as against Defendant Lauria, and Plaintiffs cannot meet their burden of demonstrating that equitable tolling is appropriate, any RICO claim arising from the Complaint that Plaintiffs may have had against Defendant Lauria is dismissed as untimely.

## V.     Amendment of the Complaint

Plaintiffs argue that they should be allowed to amend the Complaint as of right in accordance with Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, "as this amendment was not pursuant thereto but by leave of court on oral application . . . ."  (Compl. ¶ 47).  Rule 15(a)(1)(B) by its terms applies only within 21 days after service of the initial complaint, or 21 days after service of a responsive pleading or motion to dismiss.  It is thus inapplicable here.

Instead, Rule 15(a)(2) governs any further amendment of the Complaint.  That rule permits amendment only on consent or the court's leave, which "[t]he court should freely give . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Although liberally granted, courts may properly deny leave if to do so would be futile.  *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006) ("[L]eave to amend a complaint may be denied when amendment would be futile.").  Where the problem with a claim "is substantive,"

"better pleading will not cure it," and "[r]epleading would thus be futile." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The flaws in the Complaint are not only failure to plead with specificity, which perhaps could be cured with a second amended complaint (although even that may be difficult, given that two of the Plaintiffs are now deceased).  However, the other two infirmities in the Complaint cannot be cured.  The facts concerning the scope of Defendants' convictions will not change to bring them within the conviction exception to RICO's securities fraud bar.  The scope of Defendants' convictions is determined by the criminal Informations to which they pleaded guilty and which are appended to the Complaint before the Court.  Those Informations do not tie Defendants to Palagonia's sales to Plaintiffs.  That fact will not change regardless of how a second amended complaint might rephrase the description of Defendants' convictions.  Finally, Plaintiffs' case is ultimately an effort to evade the holding of *Central Bank* and to hold Defendants liable for aiding and abetting Palagonia's securities fraud on Plaintiffs.  For the reasons discussed above, as a matter of law, that is not permitted.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is hereby GRANTED in its entirety.  The Clerk is directed to close the motion at Docket 18 and to close the case.

SO ORDERED.

Dated: March 19, 2014
     New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE